We've asked the attorneys who are going to argue to step up briefly and identify yourselves for us so we know what your name is. Good afternoon, Amanda Martin on behalf of the appellate. Thank you Ms. Martin. Good afternoon, Josh Vinson on behalf of the defendant, Alexian Brothers Behavioral Health. Thank you, Mr. Vinson. We'll allot about 15 to 20 minutes for each side. We'll have an extra 10 minutes or so for reply at the end or rebuttal at the end. Please understand that we are not strict clock watchers. If we have a lot of questions, we may go over. If you're getting repetitive, we may cut you off. And focus on your main issues, please. We have read the briefs and the record, so we're very familiar with the facts of the case. Thank you. And with that, Ms. Martin, you may proceed when you're ready. Thank you very much. Good afternoon. I'd like to address specifically the issue first of the 211-17 apportionment, followed by a short discussion of the special interrogatory. And we would, of course, stand on our brief as to all the other issues raised therein. Ms. Martin, you're not picking up well on the microphone. I'm going to ask you to target the microphone. I was trying to stay central. I'm sorry about that, Your Honor. Your Honor, as stated by the court in Anderson v. Smith, the jury's verdict should be examined toward the end of ascertaining the jury's intention in returning that verdict. Here we have a situation where we have intertwined activities between Morris and Alexian Brothers. The timeline here being a critical issue to that. And the reason why I addressed the 211-17 issue to Your Honors first is because I think that dovetails then back into the special interrogatory issue. Being that in terms of what we are seeing here with the activities and the timeline is that we have a period of four years where Ms. Morrison was employed by Alexian and was actively their employee. We have no evidence and no case law to support any indication of this argument of a rogue employee being a defense or somehow that that allows them to be absolved of any liability to plaintiff. Quite the opposite. The case law supports that when someone is an employee of an employer, if they're not found to be acting outside of the scope and there was no finding in this case of that. Your position is not an exception to that rule for criminal activity? In terms of the criminal activity, there has been no showing in this case of criminal activity relative to her receipt of 466 pages of my client's records that was fully within the scope of her employment. But what we argued to the jury during the course of the case is that that was in violation of HIPAA. And also in violation of Alexian's own policies. But that that was allowed and that those records were not only kept, but they were hoarded at the desk, they weren't shredded appropriately, and that she was taking them home fully within the view of her coworkers.  If she had done just what you said, but nothing, but hadn't sent the letters, would that have been, how would that have been, how would that fit within your theory? Because it's the additional action, which was clearly a criminal action by this employee that resulted in what happened to your client. So are you saying that the simple act of taking home the records, I think we can all agree that the hospital didn't know she was doing that. So what are you saying? I mean, taking home the records, is that the basis of you saying that the hospital is responsible for her action? No, the basis of that responsibility lies with the fact that she's an employee and she's there for that period of time and she's supposed to abide by HIPAA. Part of the negligence here institutionally has to do with that. I was inartful in phrasing my question. How does that violation of HIPAA dovetail with what the employee did to cause us to bring you to court today? I mean, how does the violation of HIPAA fit within that? It's the writing of the letters that caused the problem, is it not? I mean, we're talking around it, but it's the writing of the letters. In part, it's the writing of the letters. The letters could never occur without her having the facts upon which to write them. And the clear facts of this case is those 466 pages of records. We're not talking about one sheet of record where she's talking about billing for a procedure. We're talking about her entire patient chart that talks about her sexual abuse and highly private things that are written into the record. You said the letters could not have happened without. As I understand it from reading the records, she was required to get information to submit to the insurance companies for payments. Some of those records that she was required to get would have had information that was sufficient for her to do this criminal act that she did. So are you saying that that doesn't count? I mean, I'm not sure if I'm following your argument that's the problem. No, in terms of the letters and the facts that we know in terms of that 466 pages, we're not talking about her reliance on a page or two. We're talking about in terms of the letter and the contents of it, a clear understanding of her entire patient chart. So we're not just talking about one or two that she could have cherry-picked from. And the evidence that was presented to the jury at this case was that all of this is what fed into that letter eventually occurring and that she had those records over a four-year time period as their employee. The jury was instructed, rather, pursuant to 50.11 of the Illinois Petering Jury Instructions for Civil Cases, that a corporation acts only through its employees. So in the sense that she's receiving more than what was necessary, because there was testimony received by the jury when Ms. Zentech was shown how much she requested that it was in excess. Were you proceeding on an agency theory? We were proceeding on her as an employee of a corporation which can only act through its employees. So based on that, in terms of it being, and I know there are parts in the record where Mr. Gunsberg at times said to the court, well, we're not really pursuing agency. But the fact of the matter in terms of what was presented, actually presented to the jury in this case, was a clear situation of an employee acting to get the bill paid for Alexian Brothers, ordering these voluminous records and continuing to do so and then hoarding them within her workstation at Alexian Brothers for a four-year time period. So in that sense, we believe that her actions as an employee are the actions of Alexian Brothers. And part of that, going back to where I get into 211-17 and the interrogatory, is that in terms of the interrogatory, first and foremost, the jury certainly could have looked in this case at that conduct during that period of time where she was employed by Alexian Brothers and felt that that was in part the negligence that led to, causatively, my client's damage eventually. Now, in terms of the apportionment, the reason why we believe that the apportionment in this situation is improper is because you do have a situation where it's an employee and an employer, not an agent and a wholly blameless. Correct. So in the sense that at one point in time, she was a separate court-feeser. However, there's a period in this timeline where she and Alexian are one and the same in terms of their actions. And there's no clear delineation in terms of the instructions that the jury was given. They weren't given a 50.0601 to allow them to differentiate that. That wasn't offered by a defendant. When you refer to apportionment in this argument right now, are you referring to the apportionment on the contribution instruction or the instruction on the contribution? The verdict form, essentially. Because I think and I believe that we did present our own verdict form to the court prior to closings that did not include a percentage allocation of fault because of this issue of her being Alexian Brothers for all intents and purposes. During part of the timeline, we received that from the jury. But the contribution claim that Alexian brought against Morrison was tried simultaneously with your personal injury claim, right? Yes, it was. So there needed to be instruction to the jury on the contribution claim. Yes. Okay. Yeah, I don't deny that. That is appropriate, of course. The issue that I take with it is when Alexian is allowed to use its own employee as a shield to liability by essentially having this illusory allocation of fault percentage to someone who, during a certain period of the timeline, was Alexian Brothers. So essentially, it's allocating within itself a fault percentage. And we think that that is a frustration of the purpose of 211-17 that should not be allowed. Wasn't their theory all along was that her action was the sole proximate cause of what happened here and it was totally outside the scope of her employment and that, in fact, it occurred after she left their employment? And that was their defense all along, wasn't it? I would agree with you that that was their defense. However, the case that was presented to the jury was that she took these actions to amass these records during a four-year time period that she had Ms. Doe in particular, which for all intents and purposes is what I'm most concerned with, that she had Ms. Doe's records for that four-year time period during which she was working as Alexian's employee. And, you know, in case it's, you know, of note, she was never disciplined for that. She was never let go for that. She was let go based on a web browsing violation. Well, Alexian, they alleged they weren't aware that she was doing it, that she did it in a very surreptitious way designed to keep her behavior from the eyes of her supervisors. Their defense was she was completely acting outside the scope of her employment. She was, in fact, acting criminally and she went to great lengths to hide it from us. Is that what they claimed? It is, but that was not what was presented to the jury once their testimony came out. In terms of Heidi Zentag, Doris Upchurch, Pat Kenopi, this was all done openly and without any rebuke. Counsel, wasn't the theory of group case institutional negligence versus hers? Yes, and part of that goes to the release of and the handling of these records, which is Ms. Morrison. She's the one requesting too much. She's the one that is also, as an employee now during this time period, and, as I said, not being disciplined for this, receiving these copious records, keeping them, using them to get Alexian Brothers paid. I understand that is how they would get that done. However, it was not done in an undercover, hidden way. This was done very openly to get their bill paid. And I understand that. But what you were pleading and attempting to prove was institutional negligence on the part of the hospital. Correct, which can only occur through its employees. And that was Ms. Morrison, for all intents and purposes, relative to Ms. O's claim. How do you respond to their counterargument that your objection to the special interrogatory has been forfeited or waived because it was a very perfunctory comment during the instructions conference? We'll object only for the record. And there's not much fleshing out of that. Sure. And in terms of the timing of that objection, it being towards the end of the day, the court had had us go through an attempt to try to get a preliminary review of the pedantry instructions so that at least we could then work on those and come back the following day and readdress those. That was reserved at the time, as were the rest of the issues. And they brought a second special interrogatory at that time. And we did object, for the record, to both, with the thought being that we'd get to flesh that out and argue it further following that. But we never waived any objection to that. And we certainly have, you know, continued to argue that it was not properly given because it didn't truly test the verdict. Counsel, can I ask you, in the world of objecting to jury instructions, let's take it all aside and go into the objections to evidence that's offered in a trial. If there's an objection made and there's no reason or basis given for the objection, the court assumes it's not relative or it's not related or whatever. It's a general objection. It's not specific. Was there anything other that was relevant, is what I was going for. It's always relevant if there's no basis given. Was there any discussion or did the court ask for any basis for the objection? I did give a basis at the time, which can be seen in the record following the objection. My basis was in terms of that I didn't feel it would truly test the verdict. I wasn't given time to go further into that because we were moving on to other matters. But that's been our argument all along consistently. All right. So the whole issue of waiver versus forfeiture. I mean, it wouldn't be waiver because that's a voluntary relinquishment. It would be that did not happen, am I right? I don't believe so, no. Other than that was forfeited, you're claiming you did make an objection. Absolutely. Absolutely. It was not a well-fleshed-out basis, I will say that. But I think that was in part based on the timing of it. And like I said, we were moving on to other matters and closing for the day. So in terms of getting back to talking about the apportionment issue, again, it's well discussed in our briefs that apportionment should not occur between an employee and an employer. And that's the situation that we have here for all intents and purposes in terms of our institutional negligence. Martin, did you object to apportionment prior to your post-trial motion? Yes, we did. When the 600 series was introduced during the jury instruction conference, we discussed the fact that, and at the time the court initially agreed with plaintiff that the verdict forms should be separated and that there should be a separate verdict as to Jane Doe versus Alexian and a separate verdict form relative to their contribution case. Then we came back the following day and the court had changed her mind as to that and said, no, I'm going to accept those. And we did object at that point in time, but that was the tact that the court was then taking after having considered it overnight and making her ruling. So there wasn't further discussion. And the reason for that is the court made her ruling very clear at that point in time. In terms of that, obviously you've read all the briefs. I think the situation here, again, is very timeline-centered in terms of the fact that she was acting as their employee and that our institutional negligence in part is based on her actions. And that 5011 instruction is what the jury considered in that. In terms of the allocation of fault, we believe that that should not have occurred on that verdict form. And we stand by that in the sense that it now creates a situation where an employer can say, well, even though that person was an employee for part of this time when negligence may have occurred, we're going to seek allocation here and use that to block plaintiff from actually getting liability finding that's appropriate as to our actions as an institution. We believe that's why the apportionment here is improper. Again, the special interrogatory doesn't truly test the entirety of the general verdict, and the general verdict is harmonizable with it because the jury could have certainly felt that some of that conduct occurring while she was an employee and the conduct of Alexian, that could still be the sole proximate cause being her actions. But during that time period, they are the actions of Alexian. Is there any indication that the jury even knew what sole proximate cause meant? A lot of lawyers don't understand it. So how did the jury know what sole proximate cause meant? I know that you proffered that, an instruction early on, and the court said no because there was, Ms. Morrison was a party through the third party complaint. Did you attempt later when the special interrogatory reared its head, did you attempt to go on record and say, now, judge, you know, the jury is going to be asked to consider this, whether or not this employee's action was the sole proximate cause. Don't you think they need to know what sole proximate cause means? I mean, did you attempt to retender that? I don't see anything in the record to suggest that it was ever raised again or you tried to argue it again. Wouldn't that have been something that you should have done? I agree, and I believe that I did. I don't believe it appeared on the record, but my recollection is that. But you have to go by the record. I do understand that. In terms of when we first proffered it, it was ‑‑ I commend you for agreeing. A lot of lawyers, when they drop the ball, they won't agree that they dropped the ball. So I think that's commendable. Go ahead. Well, I appreciate that. But, yes, we do make mistakes, obviously. And, obviously, in terms of the sole proximate cause issue, it's a term that we use all the time, although, as you said, not all of us understand it completely. But I think in this sense, yeah, the jury was not given any definitional explanation of that, and we do believe that that was a problem, too, in terms of them then taking the special derogatory and answering it. And, obviously, they did have an issue with it because they did come back with a jury question on it. Do we have to answer this, and is it part of verdict form C? So I believe there was confusion occasioned by it, in part due to no definitional term being given for it, which there is case law saying that that makes it improper in and of itself. And then the fact that it ‑‑ That's kind of inconsistent with your argument that it wasn't, that the two things are not in conflict. So I'm not sure which path you're going down, but that's my question about whether or not the jury is confused. It's not, you know, if you answer that yes, then it's hard to say the answer to the special interrogatory is compliant with your general verdict because it can't be both, one or the other.  I know you're arguing that it can be both, but I disagree with that because it makes no sense. You know, answer yes to one and then no to the other. How can you reconcile that? You make some arguments, and I think most skilled lawyers make good arguments. Sometimes the arguments don't quite answer the question as we know, but I don't think that the two, that your answers can be the same. If it's confusing, then it can't be in sync with the general verdict. I don't see how the two can be the same. Well, the jury could answer a question it doesn't fully understand how to answer is how I answer that, which is that yes, they're being given a term that they don't fully understand. Can they still answer that question and have it match and be molded to form their general verdict? And I believe that's in this case what they tried to do. I think that part of that, though, in terms of understanding what sole proximate cause was, that's why they answered it a yes, and that's what then leads to the fact that it's confusing in terms of when the trial court had to deal with it at that time. Well, you know, there was no caption on the special interrogatory form that went to the jury. They thought it was part of verdict form C. It just seems a little unusual. Well, I know in part, and rereading the record this morning, when the judge, when she was describing and reading the pattern during instructions to the jury, she laid out specifically first you're going to look at verdict form A, then you're going to look at verdict form B of this, and then C, and then answer the question at the end. So I believe she did describe to the jury that it was separate as part of the instruction. It's helpful to have a caption on it so the jury know what they're looking at. These are 12 ordinary people who are not versed in the law, and I think giving them information that they need so they can make a rational decision is usually a good idea. I agree. Let me ask you to bring your argument to a close, please. Thank you. Thank you for your time. All right. Mr. Vinson. Good afternoon. May it please the Court. Again, for the record, Josh Vinson on behalf of the defendant. Alexi Vinson with me at the counsel table is trial counselor, my partner, Matthew Walsh. There's a pretty significant waiver problem in this case, and I think that's the part that I want to start at. Voluntary relinquishment of a known right. Yes. A waiver, maybe voluntary relinquishment. It wasn't a forfeiture, Gary. No, it's a waiver here. Explain it. Okay. Well, we're talking about jury instructions, and 2-1108 says that a special interrogatory is treated the same way as a jury instruction. And all the arguments that Ms. Martin made about apportionment, contribution, again, we're talking about the jury instructions, and the case law is pretty clear that if you're going to object to a special interrogatory, just as you would to a jury instruction, and, again, talking about the contribution apportionment instructions as well, you have to make a timely and specific objection, just like the point Your Honor raised with respect to when evidence is objected to. It has to be timely and specific. Now, when the special interrogatory was offered in this case, this is the sum and substance of the instruction. I'm sorry. It, of course, said, so, approximate cause, any objection, and we're looking at the supplemental record, page, third supplemental record, pages 8, 59, and 60. So, approximate cause, any objection, the special interrogatory was Michelle Morrison's actions, the sole approximate cause of plaintiff's claims, injuries, yes or no. Wait. Are we on the approximate cause, or are we on the special interrogatory? Special interrogatory. Yeah. Okay. And Ms. Martin says, quote, we would object to it for the record, Your Honor, just based on the fact that we don't think there's evidence that could ever sustain something being the sole approximate cause based on evidence, but that's just our objection for the record. So. It wasn't specific enough? Well, this doesn't mention any of the arguments that Ms. Martin has made before you today or that are in her brief. None of those are made. You know, and I've got to say, in fairness to the trial judge, when you're looking at the trial judge's situation, and all of you have been trial judges, how can you possibly reverse a trial judge for a ruling that, on a basis that was never argued to the judge, and the judge was never given an opportunity to consider it? And so in this case, there's absolutely no argument made with respect to defining sole approximate cause, that, as Your Honor, Justice Cunningham pointed out, 204 instruction was not offered at that time saying we've got to give a definition. There was no argument made whatsoever that this would not decide an ultimate factual issue in the case, which is what she was arguing here before, or that it wouldn't be inconsistent with the general verdict against the hospital. None of those arguments were made. So how unfair, I mean, that's the whole point of the requirement that an objection be made timely and that it be made specifically is to give the trial judge an opportunity to make the right ruling. It was made timely, right? It was made timely. And your argument, it wasn't specific enough. Correct. Based on what? It's not specific at all. Oh, it wasn't specific at all. No. I mean, the only issue that was raised is the evidence was insufficient to support sole approximate cause. That's not an argument that Ms. Martin was making on appeal that's in her brief. They're not arguing that the evidence was insufficient to support the sole approximate cause argument. They're arguing that it wasn't defined. They're arguing that it doesn't decide an ultimate issue in the case. But she's not arguing anything about the sufficiency of the evidence. And, in fact, when the thing was argued, you know, an argument was made that there was a 100 percent basis for a 100 percent contribution against Michelle Morrison in this case. That was argued extensively in closing. That was the whole point of the defense as the court has recognized that the conduct was criminal and that the hospital had nothing to do with what occurred here. So none of these objections were made. And the same thing is true with the opening argument that Ms. Martin just made to you about a Quarterman fault in contribution. If you look at the record of pages supplemental record, third record again, 828 and 840 to 854, that's where the contribution issues instruction and that's where the contribution verdict forms were offered. No objection. In fact, when we raised the contribution and apportionment issues and asked that they be included in the issues instruction, Ms. Martin agreed to actually write the instruction and incorporate it right in it. The only objection she has, she didn't want the word criminal in it. That was taken out. But she agreed to bring back the instructions that contained all the apportionment and contribution issues incorporated right into the issues instruction and bring it back to the court, and that's what she did the next day. There was no objection to any of this. And so, again, for her to come up here and say, you, you should reverse Judge Manoa for making the wrong decision based on an argument I would have made to Judge Manoa is totally unfair. That's totally unfair to the trial judge, and that's inappropriate to this court. I mean, if she's right, and I'm not conceding that she is, but if she were right, that might have allowed Judge Manoa the chance to make the right decision and avoided the appeal. That's the whole point of making a specific objection that raises the grounds that you're going to argue an appeal. Yes, and none of this has been preserved for appeal. Everything, literally everything that Ms. Barton is arguing to you was never argued below until the post-trial motion, after the whole thing was over, when it was too late. Let's put the waiver issue aside for a second. Sure. And talk about what we have in front of us is we have a contribution verdict that says 80-20. Yes. And we have a special interrogatory that basically says 100. Correct. And how are those reconcilable? They're not. That's why the special interrogatory trumps the general verdict. That's the classic reason why the verdict had to be set aside, because they can't be reconcilable. And as Justice Cunningham has pointed out, if you've got an 80-20 general verdict and you've got a special interrogatory that came back from the jury that said that the third-party defendant was the sole approximate cause of the injury, that's it. End of game. Let's talk about the use, sole approximate cause. Just to back up for a minute. Yeah. As far as approximate cause, it's as plain as fur, right? To show approximate cause. Yes, absolutely. And it's the jury's decision of fact that they decide on what is the approximate cause, right? Agreed. It's a decision by the jury. Agreed. As far as sole approximate cause, that's a defense that's offered by the defendant, is it not? No. If you read the Douglas case, I think Justice Ellis wrote it, and the Leonardi case. There are other cases, though, that say it is a defense offered by the defense, is it not? The defense should offer it. But it's always the plaintiff's burden, as you pointed out, to prove approximate cause. And if the defendant has evidence that someone else was the sole, I mean, this is what the Douglas case says. The Douglas case says that you can always argue that the plaintiff failed to prove I was the cause of the injury by saying that someone else was the sole approximate cause. That's the defendant's burden. Correct. But, well, it's not a burden. You don't have a burden to prove it. It's the defendant's defense. But it's not the plaintiff's burden. No, the plaintiff's burden is to prove approximate cause. The defense is that you failed to do it because the evidence shows someone else was the sole approximate cause. The jury was instructed as to approximate cause. Yes. As to what that is. Yes, they were. Were they instructed as to what sole approximate cause is? There's no need to define the word sole. Why not? Well, first of all, sole is a common term that, as the courts explained in other decisions, simply means only or exclusive. The words, the proximate cause is the thing that needs to be defined. And the instructions do define proximate cause. I understand that. But 1204 doesn't define it. Let's be real here. Most lawyers don't understand proximate cause. And you're standing here telling us that a jury of 12 people who may never have been in a courtroom before understand and can extrapolate what sole proximate cause means? Well, first of all, the 1204 instruction doesn't define sole proximate cause. It says you measured it. Yes, but it doesn't define it. There's no instruction that defines it. The only instruction that defines proximate cause is the 12-15-01. I agree. It defines proximate cause. I agree. There's no instruction that defines sole, and that's because the word sole is a term that we use in everyday parlance. If I tell you what proximate cause means, and then I say that there's some of the sole proximate cause, I think most people would understand that means either the only or exclusive. Why even have it in 1204 and 1205, then? Why even mention it? Because the committee comments point out when you have a situation where you're making a sole proximate cause argument as to someone who's not a party, and that's not this case. And that's why the judge didn't give the 1204, and they didn't offer that half of 1204. Well, 1204 says that, but does 1205 say that as well? Well, it's the same instruction. It's just that one is a person and one is a thing. Not at all. Well, 1204 is if some person doesn't. I understand the difference. And they comment. They don't say it's not a party. Well, that's true, but this is not a 1205 case. I understand that. But I'm making that distinction because this is such an unusual area of the law. And we're having, again, as Justice says, 12 people decide these issues of great conflict and consequence, but maybe they don't understand them. Well, it's entirely possible that I suppose that the Instructions Committee for the Supreme Court might want to consider whether it's necessary to do that. But right now the instructions don't require a definition. The instructions say that if a person is a party, you don't give the 1204. 1204 doesn't define it, and they never offered it. Let me, again, I'm looking at page 15 of your brief where you quote the committee comments on 1204. Yes. All right. And we've talked about it shouldn't, the instruction should be used only where negligence of a person who is not a party may occur to contribute. Correct. The second sentence is this instruction may not be used where the third person is acting as the agent or the defendant. Correct. Okay. Let's go to that issue. So in order to understand why sole proximate cause of what happened here with this whole agency thing that Ms. Martin has argued is completely incorrect is you've got to understand how this case was presented to the jury. All right. At the outset of the case, if you go to page C63 of the record and look at the original complaints, it's in ten counts against two defendants, the hospital and Ms. Morrison. And that ten-count complaint contained institutional negligence, direct negligence claims against the hospital and claims against Ms. Morrison, and it included vicarious liability claims against the hospital based on Ms. Morrison's misconduct. Now fast-forward to page C1191 of the record where on the eve of trial, plaintiff dismisses Morrison as a defendant, files a Fourth Amendment complaint, five counts. There is no vicarious liability theory in that Fourth Amendment complaint. It is a pure institutional negligence claim. And all five counts went to trial. No, only two. Okay. The only counts that went to trial when you go to the issues instruction, all right, it says two counts, and that's the institutional negligence count, which talked about not having sufficient policies in place, not keeping close supervision of Ms. Morrison, not watching how many copies she was making. But it has absolutely nothing to do with Ms. Morrison's conduct. And that's the key in this case. How did that come up? Through what witnesses, Ms. Morrison's conduct? Well, Ms. Morrison testified. As whose witness? Well, I'm trying to remember. I think we offered her, actually, as a witness. As a witness, right. That's what you're trying to prove, right. Yeah, that she stole the records on her own. That's correct. And that was part of our contribution claim and part of our sole proximate cause argument. And that was your defense that was offered, is my point, right? Yeah, that's true. Okay. Our point was they failed to prove proximate cause against us because she was the sole proximate cause. When you get to the plaintiff's closing argument in the case, there was no argument made like Ms. Martin made here that somehow what they were trying to do was hold the hospital liable for what Ms. Morrison did. They said the exact opposite. If you look at pages 2542 and 43 of the record where the plaintiff's closing argument appears, he says it's not about Morrison. But doesn't the court tell them it's not evidence in the case, the closing argument? Yeah, that's true, but that was their theory of the case. I understand. Well, I'm not understanding your question, then. Well, it's not evidence. What was the evidence in this case as to the liability? That's exactly what the evidence was. The evidence was, as he said in closing argument, that decisions were made at the highest level at the hospital about the policies with respect to records in HIPAA and privacy and confidentiality that weren't sufficient to prevent what Ms. Morrison did. So it's two separate cases. The case that they tried to the jury was purely an institutional direct negligence case against the hospital based, as I said, and based, as you look at the issues instruction and the complaint, based solely on failure to have proper policies in place. This was the evidence. This was what their expert testified about. They didn't have enough policies. They didn't have enough supervision. They didn't keep track of the copies of records that were made. They didn't keep a close enough eye on Ms. Morrison. All of those things are institutional negligence claims based on the agency, not of Ms. Morrison, but of the hospital's highest-level decision-makers. Where did the 20 come from? My guess? I mean, we can only speculate about it, but I think that was a compromised verdict. And that's what the purpose of a special interrogatory is for, is to expose when the jury has reached a compromised verdict. And that's what I think happened here. They went 80-20, but when they were asked the question, that maybe perhaps they didn't fully understand the significance of finding sole proximate cause was Ms. Morrison, the legal significance of it. I think they understood what it meant, but I don't think they understood the legal significance. Does it also mean that they were confused? No, I don't think they were confused at all. I think the special interrogatory demonstrates that they were confused in the least. When they asked Cora Blank, you know, was she the sole proximate cause of the plaintiff's injury, the answer was yes. And I think we are presuming. But then the C12 people said 20% of the damages should go to the hospital. Well, but the jury is presumed to know and understand the instructions. So they're presumed to know and understand what proximate cause meant. I'm sorry. President Smart versus Citi, and then a Lundquist case, said that special interrogators should use the same language and terms as the jury instructions. Well, this one did. It used proximate cause. I mean. Sole proximate cause. Well, Your Honor, you know, I don't think that you could possibly have a situation where every word in an instruction would actually be identical. Because that would be confusing. I mean, what's that? Well, sole is logic of the dog, counsel. Don't make that argument. I agree. But sole is also, I think, as the Douglas case from this court points out, commonly understood to mean the only or exclusive. We use it every day. People use it every day. It's proximate cause that's the legal term of art that people might not understand, and then that's defined in the instruction, and that's used in both the instruction and the special interrogatory. The point is the way the case was tried was not a case based somehow on the liability of the hospital for what Ms. Morrison did. The case was tried on the basis the hospital was institutionally negligent because it didn't have sufficient policies and procedures in place. It was not. The plaintiff was not trying to hold the high, and that's what their expert testimony all went to. The hospital was not tried on the theory that what Ms. Morrison did should be somehow attributed to the hospital through a theory of vicarious liability. That's the theory that plaintiff dropped from the case on the eve of trial. They made a strategic decision to go straight and strictly with the institutional negligence claim and not try and prove a vicarious liability case. So for Ms. Martin to come up here and tell you that somehow this case involved a theory of liability to try and implicate Morrison's conduct to the hospital is the exact same kind of flip-flop that the plaintiff tried in the Ahmed versus Pickett Conduct Association case. In the Ahmed case, also a special interrogatory case involving sole proximate cause, undefined. The plaintiff in that case alleged a child drowned in the pond at a condominium complex by becoming entangled in a rusty bicycle. And the jury was asked, was the rusty bicycle the sole proximate cause of the plaintiff's injury? And the jury said, no. And so on appeal, the plaintiff said, well, there were other bicycles in the pond. It wasn't just the rusty one. The jury could have found in our favor, based on the fact that there were other bicycles in the pond, not the rusty one, and this court said, no, you can't change your theory on appeal like that because you don't like how the special interrogatory came back. And that's exactly what we have happening here, okay? The theory that was tried in the case was a straight institutional negligence case, not based on vicarious liability of Ms. Morrison. And now that the special interrogatory found that Morrison was the sole proximate cause of the injury, the plaintiff wants to say, oh, no, no, no, no. We actually did try a case based on vicarious liability of what Ms. Morrison did. The jury has to convince me or us that there was no confusion here. And the fact that the jury found 80-20 on one side and then 100 percent on the other side indicates confusion to me. And I'm sitting here listening to you, and you're not convincing me that there is no confusion. You've got to do that. You have to write something, okay? And something has to make sense. Special interrogatories, Your Honor, are used for precisely this purpose. You could always say in the case where a special interrogatory conflicts with a general verdict, well, the jury must have been confused because that's the whole point. They're irreconcilable. That doesn't mean they're confused. What if it's a proper informed counsel? If it's improper informed, that's okay for special interrogatory? This one wasn't, though. Well, the argument can be made it was improper informed. But it hasn't been made. Can the court bring up their own arguments? Oh, certainly. But that wasn't argued below, and it certainly wasn't argued here. Because the issue of sole proximate cause has emerged as the issue in the case, I think it's very important that the form of the special interrogatory be addressed because the case turns, a lot of this case turns on that. But I guess I don't understand what the argument is about what's improper about the form. The question in the special interrogatory simply said, was Michelle Morrison's conduct the sole proximate cause of plaintiff's injury? So I don't see where there's any error in form with respect to the original. Again, not so, which is not in any of the instructions, and which is a term that probably should be defined. But there's no case that's ever required that that be defined, And there are myriad cases that have held the sole proximate cause interrogatory is appropriately given in a case where it will decide an ultimate factual issue in the case, as this did. Aren't there cases where the language should be the same or similar, the interrogatory, special interrogatory, and jury instruction? And this one was. It used the term proximate cause. It was not the same. Well, Your Honor, I don't know. Was it exactly the same? Well, I'm not understanding that. I want to understand what your, the legal point is here. Are you saying that the 1204 instruction should have been given to help define it? I'm not going to answer any of your questions. Well, no, I'm trying to understand your question. I just want to make sure I'm answering your question. I'm not asking. That's okay. I'm just trying to understand your question. Thank you. The whole point, I think, is that the 1204 needs to be given and is appropriately given, as the comments say, when a person is not a party to the case. And that's why Judge Minella didn't give it in this case initially, and it wasn't offered when the special interrogatory was later tendered, which is the waiver point that I brought up before. Let me ask you to bring your argument to a close, please. Sure. I think we've covered just about everything I wanted to cover. I don't think that there's any question that with respect to the apportionment of fault that, as I said, that wasn't raised below as an objection to the instructions. There was no objection made to the contribution instruction. I think those were properly submitted to the jury, and it's clear that the special interrogatory is irreconcilable with the 80-20 verdict, and that's why it controls. We would ask that you refer. Thank you very much, Mr. Benson. Thank you. Ms. Martin, you may give a brief rebuttal. This case took five weeks to try. I take umbrage with counsel's insinuation that somehow this institutional negligence case is boiled down and can be boiled down to plaintiff's expert testimony, which was received by the jury out of two days, maybe two-and-a-half days, of this five-week long trial where they heard from numerous Alexian Brothers witnesses who talked about the conduct specifically of Michelle Morrison while she was an employee there. That was the bulk of the testimony received by the jury in this case. So to act as if during the course of that trial we just are boiled down only to our pleadings and the substance thereof I think is illusory at best and certainly doesn't comport with what the evidence was that was received by the jury in this case. Ms. Martin, when the court decided to allow the special interrogatory, did you make a motion to ensure that the language was consistent with the jury instructions that had already been agreed to? So at the point in the day when this is occurring, this is occurring late in the afternoon, I actually tendered the 1204 in modified form in part because we saw that these potential issues were going to occur relative to their special interrogatory. It was properly refused by the court in terms of her being a party. At that point in time, the court made its ruling abundantly clear that based on committee comments, a 1204 instruction relative to sole proximate cause would not be appropriate in this circumstance. The special interrogatory came up shortly thereafter. The court already having made its ruling, I didn't think it was appropriate at that time to beat a dead horse when I had already made my feelings on that clear by tendering that instruction. Well, I'm talking about the language of the special interrogatory that the defense tendered. That language was clearly not consistent with the jury instructions. So did you object to the language in the special interrogatory and try to get the court to have them amend it or reword it so that it was consistent? I think that's my question. Initially, when it was brought forth to the court, and as I mentioned, there were two of them, the court had discussed that they, the two interrogatories themselves would potentially conflict. She asked defense counsel to come back the following day and possibly resubmit the two interrogatories or submit a rephrased one. So at the time when I made my initial objection relative to there not being enough evidence in the case to support a sole proximate cause special interrogatory, in line with the fact that our sole proximate cause 1204 had been refused by the court, we felt at that point in time we had made our record in terms of feeling that that special interrogatory was not appropriate. You haven't answered my question, but that's all right. Go ahead. Well, I apologize for that. In terms of when it was brought up the following day, there wasn't any further discussion on it at that point in time. So just to wrap up, in terms of the institutional negligence, again, the 50.11 instruction that was received by the jury is clear in terms of defining for them that the actions of the employee while employed by the defendant are its actions, are Alexian's actions. Michelle Morrison's actions during that four-year time period when she received all these records, that was Alexian Brothers' action. They received that instruction, and based on that, they found 80-20 and did that allocation of fault. But that was after they made a finding, and they were instructed multiple times by the court that there were two separate cases being tried here, that they first made the finding in favor of Plaintiff Jane Doe and against Alexian and awarded in that fashion. We believe that the interrogatory that they answered, and we do believe that it's possible they could have been confused as to the term sole-prax cause and that no, it shouldn't have been given in the first place. But the argument is that since it was given, we do believe that they are harmonizable amongst one another, that the verdict itself and the special interrogatory answer, because of that timeline that we're looking at where she's acting as their employee, and essentially that is the hospital, and then separately thereafter, that she could still be seen as the sole proximate cause by the jury and that their general verdict should control. Thank you for your time. Thank you very much, counsel, for your arguments. The court will take the matter under advisement. There being no other cases on the agenda for today, the court will stand in recess.